UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------X

BARBARA TILLMAN,

               Plaintiff,         **MEMORANDUM & ORDER**

   - against -              21-CV-4827 (KAM)(MMH)

GRENADIER REALTY CORP. and GRC
MANAGEMENT,

             Defendants.

------------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

      Plaintiff Barbara Tillman (the "Plaintiff") brings three causes of action against Defendants Grenadier Realty Corp. and GRC Management (together "Grenadier" or the "Defendants") based on alleged discrimination in violation of (1) the Age Discrimination in Employment Act, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); (2) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq.; and (3) the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code, § 8-101 et seq. (*See* ECF No. 1, Complaint ("Compl.").) Plaintiff seeks declaratory and injunctive relief; compensatory, liquidated, and punitive damages; and other appropriate equitable and legal relief. (*Id.* at pp. 10-11.) Defendants move for summary judgment dismissing Plaintiff's complaint in its entirety. For the reasons set forth below, the Court grants Defendants' motion for summary judgment

with regards to Plaintiff's ADEA claim, and declines to exercise supplemental jurisdiction over Plaintiff's state law claims, which are dismissed without prejudice.

**BACKGROUND**

**I.   Factual Background**

The following facts are taken from the parties' Local Rule 56.1 statement and counter-statement, as well as from documents and transcripts cited in the parties' Local Rule 56.1 statements. (*See* ECF No. 45-2, Defendants' Statement of Undisputed Material Facts ("Def. 56.1"); (ECF No. 46-1, Plaintiff's Counter-Statement ("Pl. 56.1").)  Except as otherwise indicated, the facts set forth below from the parties' Local Rule 56.1 statements are undisputed. The court summarizes only those facts that are relevant and material to the adjudication of the instant motion.

Plaintiff Barbara Tillman, who was 84 years old at the time of the filing of the Complaint, worked for Grenadier between May 1976 and March 2020.  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Defendant Grenadier Realty Corporation is a property management company, and Defendant GRC Management is an affiliated entity that operates as an LLC.  (Def. 56.1 ¶ 2.)  Plaintiff served in many different roles at Grenadier, beginning with overseeing rentals at a housing development in Brooklyn called Starrett City (also known as "Spring Creek Towers").  (Def. 56.1 ¶¶ 4, 14-16; Pl. 56.1 ¶ 4.)  Plaintiff's most recent role at Grenadier prior to her separation was Director

of Energy Services.   (Def. 56.1 ¶ 1.)

Plaintiff's work at Grenadier included energy conservation work, including organizing and directing Starrett Energy Services, an energy conservation department for Grenadier's properties. (*Id.* ¶ 17.)   This work led Plaintiff to become Grenadier's Senior Vice President for Energy and Special Projects, and Plaintiff's duties included overseeing the operations of the Starrett City Power Plant, Local Law 84 and 87 compliance,[1] and other energy and conservation efforts.   (*Id.* ¶¶ 18-19.)   From the 1970s until February 2019, because Plaintiff performed a substantial amount of work for both Grenadier and Starrett City, her salary was split between the two entities, with each paying half.   (*Id.* ¶¶ 22-24.)

Grenadier first began managing the Starrett City property in the mid-1970s, and the property remained Grenadier's largest and most lucrative contract throughout the period in which Grenadier managed it.   (*Id.* ¶¶ 31-32.)   In the fall of 2017, however, the ownership of Starrett City announced that the property was up for sale, and on May 8, 2018, the property was sold to a separate entity, BSC.   (*Id.* ¶¶ 34-35.)   BSC severed the property management relationship with Grenadier shortly thereafter, and Grenadier ultimately ceased managing the Starrett City property in February

---

[1] "Local Law 84 requires residential housing buildings to report their energy and water usage to New York City on a yearly basis, while Local Law 87 requires such buildings to report the state of their energy conservation every ten years."   (Def. 56.1 ¶ 20.)

2019.  (*Id.* ¶ 36.)   The loss of the Starrett City contract was significant to Grenadier, and a Grenadier Board Member testified that the Starrett City contract alone made up more than a third of Grenadier's entire revenue in 2017 and 2018.  (*Id.* ¶ 37; Pl. 56.1 ¶ 37.)  Following the loss of the contract, Grenadier began cutting costs, including revising its severance plan to limit the amount of severance to which officers were entitled.  (Def. 56.1 ¶ 40, 44.)   Grenadier ultimately terminated its severance pay plan completely on July 8, 2019, reduced the amount of vacation entitlements for employees, and transitioned to a less expensive health plan.  (*Id.* ¶¶ 46-47.)

Grenadier also underwent an organizational restructuring process and engaged in several rounds of layoffs following the loss of the Starrett City contract.  (*Id.* ¶ 49.)  As these layoffs began, Plaintiff communicated with Roderick Robertson ("Robertson"), Grenadier's Director of Human Resources and Administrative Services, in February 2019, inquiring as to whether she would be terminated from employment.  (*Id.* ¶¶ 6, 59.)  Based on Plaintiff's communications with Robertson, Grenadier's Board of Directors scheduled a meeting with Plaintiff to discuss her continued employment.  (*Id.* ¶ 60.)  Peter Gray ("Gray"), a member of the Board of Directors, attended the meeting on March 13, 2019, along with Plaintiff, Robertson, and David Goldban ("Goldban"), Grenadier's General Counsel.  (*Id.* ¶¶ 7, 61.)  During the meeting,

4

Gray explained that Grenadier planned to retain Plaintiff in her current position, given that there were projects available for her to work on, including cogeneration projects at some properties and compliance work. (*Id.* ¶¶ 63-64.) Plaintiff did not immediately respond to Gray's request that she continue on as an employee and asked for time to get back to Grenadier with a final decision. (*Id.* ¶¶ 65-66.) Plaintiff later conveyed to Robertson that she planned to stay at Grenadier in her current role. (*Id.* ¶ 67; Pl. 56.1 ¶ 67.)

In retaining Plaintiff, Grenadier assumed the full cost of her salary, given her salary had previously been shared evenly with Starrett City. (Def. 56.1 ¶ 69.) Around the time that Plaintiff made the decision to remain in her role, Grenadier retained Javelin Residential ("Javelin"), a consulting company, to perform, among other things, an operational assessment of Grenadier following the loss of the Starrett City contract. (*Id.* ¶¶ 70-71.) Grenadier and Javelin agreed to a four-month engagement from April 2019 to July 2019. (*Id.* ¶ 74.) Javelin completed its initial review and submitted a report to Grenadier which included the following recommendation for the Special Projects department, which fell under Plaintiff:

> At the time of our review, we were informed that the functions of this department had been suspended and the department head was not working from the corporate office. A formal review was not conducted; however, based on our first month of this assignment services

5

were not being provided to the properties. As the focus
was primarily in the area of energy management, value
exists in maintaining a role. Our initial thought is to
restructure the role within another department to
provide better coverage and accountability.

**Recommendation: Restructure this role to sit under
Operations/Technical Services.**

(ECF No. 46-3, Exhibit A to the Clark Declaration ("Pl. Ex. A"),

at 8-9[2] (emphasis in original).)

Around the time that the Javelin review was ongoing, Felice

Michetti ("Michetti"), Grenadier's then-CEO and Chairperson, was

separated from the company on April 1, 2019. (Def. 56.1 ¶ 83.)

Gray testified in his deposition that the ownership of Grenadier

began to search for a new CEO in "probably February or March" of

2019. (ECF No. 48-3, Deposition of Peter Gray ("Gray Dep."), at

97.) Discussions began with Ryan Moorehead, the founder of Javelin

-- the company conducting the operational assessment -- at some

point thereafter, and Grenadier and Moorehead reached an agreement

for Moorehead to become CEO in August 2019. (Def. 56.1 ¶¶ 71,

90.) Ultimately, Moorehead was referred to as Grenadier's CEO

beginning in September 2019, and the company reached a written

agreement regarding his role as CEO in December 2019, with a term

to begin on January 1, 2020, and conclude on December 31, 2021,

subject to renewal. (*Id.* ¶¶ 91-92.)

After Moorehead joined Grenadier as its new CEO in September

---

[2] Unless otherwise noted, the Court's pincite refer to the ECF-assigned page
number, and not the internal pagination or bates number of the document itself.

2019, he had an oral conversation[3] with Plaintiff regarding whether she had considered, or would consider, offering her energy services as a consultant. (*Id.* ¶¶ 106-08, 111.)  Plaintiff rejected Moorehead's idea and stated that she wished to remain an employee of Grenadier. (*Id.* ¶ 112.)  One or two weeks later, on October 4, 2019, Plaintiff emailed Moorehead, referenced the prior conversation, and stated "I believe I should assume that I'm just about laid off." (*Id.* ¶ 113.)  Moorehead replied by email as follows:

> Not the case. You are still employed by GRC, with title, pay and duties until you hear otherwise from me. I asked that you take some time to think about the proposal of becoming a consultant and what that would need to look like for you.

(ECF No. 46-3, Exhibit KK to the Clark Declaration ("Pl. Ex. KK"), at 252.)  Plaintiff remained in her current position with Grenadier following the email exchange. (Def. 56.1 ¶ 117.)  At some point thereafter, Moorehead proposed that Plaintiff's job functions either be transferred to a third-party company or that Plaintiff be offered a written consultancy proposal to become an energy consultant. (*Id.* ¶ 122.)  Grenadier also contemplated further layoffs, outsourced some accounting functions, and outsourced some safety and violation services at this time. (*Id.* ¶¶ 125, 128-29,

---

[3] Plaintiff disputes the characterization of the conversation in the Defendants' Rule 56.1 statement but agrees that the conversation occurred and that the topics discussed included, among other things, whether she had considered switching from begin an employee of Grenadier to being a consultant. (Pl. 56.1 ¶ 108.)

135.)

Following Moorehead's recommendation, Grenadier offered Plaintiff a consultancy agreement to provide energy services directly to managed properties. (*Id.* ¶ 136.) Robertson later described the idea of offering Plaintiff a consultancy as "a way to help the company financially, but also maintain [Plaintiff's] expertise." (ECF No. 48-4, Deposition of Roderick Robertson ("Robertson Dep."), at 178.) During the discussions between Plaintiff and Moorehead about becoming a consultant, Plaintiff asked Moorehead to give her a "proposal" regarding the consultancy arrangement. (ECF 48-1, Deposition of Barbara Tillman ("Tillman Dep."), at 137-39.) Moorehead drafted a written consultancy agreement with the assistance of counsel and presented the agreement to Plaintiff on February 28, 2020. (Def. 56.1 ¶ 140.)

The written consultancy agreement stated that Grenadier would pay Plaintiff a monthly retainer fee to monitor seven different properties, most of which Plaintiff previously provided energy-related services to or was familiar with. (*Id.* ¶¶ 141-42.) In exchange for her services, Plaintiff would receive a monthly retainer fee for each of the seven properties for a total of $3,300 per month, which would work out to less than $40,000 per year. (*Id.* ¶ 144, 147; *see also* ECF No. 46-3, Exhibit I to the Clark Declaration ("Pl. Ex. I"), at 32-39.) Plaintiff declined the consultancy proposal after receiving it, noting during her

8

deposition for the instant case that at the time the pay "had a big effect on me" and that she did not attempt to negotiate a better deal because she "thought it was hopeless." (Tillman Dep. at 141-42.) Moorehead subsequently recommended Plaintiff's termination to Grenadier's Board of Directors. (Def. 56.1 ¶ 154.) Moorehead informed Plaintiff of her termination during an in-person meeting on March 6, 2020. (*Id.* ¶ 159.) Following Plaintiff's termination, Grenadier distributed some of Plaintiff's energy-related tasks, including Local Law 84 and 87 compliance to third parties. (*Id.* ¶¶ 165-66; 169.) Moorehead testified at his deposition that Grenadier does not pay these third party energy consultants for their work, and the consultants are instead paid out of a commission the consultants receive in connection with energy purchase contracts they execute. (ECF No. 48-5, Deposition of Ryan Moorehead ("Moorehead Dep."), at 263-64.)

## II. Procedural History

Plaintiff filed a charge against Grenadier alleging unlawful age discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on December 21, 2020, and the EEOC issued Plaintiff a notice of her right to sue on June 10, 2021. (*See* Compl. ¶¶ 5-6.) Plaintiff subsequently filed her complaint in this case on August 26, 2021, alleging age-based discrimination under Federal and New York law. (*See generally id*.) Defendants appeared and answered on September 24, 2021, and did not assert

any counterclaims.  (ECF No. 7, Defendants' Answer.)  The parties subsequently engaged in discovery and certified the close of all discovery on September 28, 2022.  (ECF No. 23, Status Report.)  A pre-motion conference was held on January 3, 2023, to discuss Defendants' anticipated motion for summary judgment, and a briefing schedule was ordered.  (Minute Entry dated January 3, 2023.)  After the motion for summary judgment was filed, but before it had been decided, the parties requested a settlement conference before Magistrate Judge Marcia Henry, which was held on June 23, 2023.  (Minute Entry dated June 23, 2023.)

Although a settlement was not reached, the parties expressed an interest in continuing settlement discussions, and the Court terminated the pending motion for summary judgment to facilitate further settlement discussions.  (Docket Order Dated June 26, 2023.)  Additional settlement conferences were held on July 13, 2023, and September 13, 2023, but a settlement was not reached, and the Defendants therefore renewed their motion for summary judgment on September 20, 2023.  (*See* ECF No. 45, Notice of Motion for Summary Judgment; ECF No. 45-1 Defendants' Memorandum of Law ("Def. Mem."); ECF No. 46, Plaintiff's Memorandum of Law in Opposition ("Pl. Mem."); ECF No. 47, Defendants' Reply in Support ("Def. Reply").)

## **LEGAL STANDARD**

Defendants move for summary judgment pursuant to Federal Rule

of Civil Procedure 56, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. For a genuine issue of material fact to exist, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

In reviewing a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d. Cir. 1996)); *accord Tolan v. Cotton*, 572

11

U.S. 650, 651 (2014) ("[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (alteration in original) (quoting *Anderson*, 477 U.S. at 255)).

The moving party has the burden of establishing the absence of a genuine dispute as to any material fact, and in opposing summary judgment, the nonmoving party "need only present evidence from which a jury might return a verdict in his favor" to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 256-57. To meet this burden, however, a party opposing summary judgment must "come forward with specific facts showing that there is a *genuine issue for trial*," not merely "show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

It is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir. 2001). "[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). Nonetheless, the Second Circuit has "emphasized that trial courts must be especially chary in handing

12

out summary judgment in discrimination cases, because in such cases the employer's intent is ordinarily at issue." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 87 (2d Cir. 1996); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71 (2d Cir. 2000).

## DISCUSSION

Defendants seek summary judgment as to all of Plaintiff's claims of discrimination, arguing that her termination "was completely driven by economic considerations" and therefore her claims of age discrimination are "untenable." (Def. Mem. at 3.) Defendants further argue that the allegedly ageist comments highlighted by Plaintiff "fail to show discriminatory intent" and were "singular, isolated questions" made to Plaintiff five months prior to her termination. (*Id.*)

Plaintiff argues in opposition that Defendants seek summary judgment "based largely on the testimony of interested witnesses" and that the testimony of these witnesses forms the basis for many of Defendants' arguments regarding the need for cost-cutting efforts. (Pl. Mem. at 1-2.) Plaintiff further argues that Grenadier "removed many of its older employees beginning in March 2019" including Michetti, who was 69 years old at the time of her removal, and Plaintiff, who was 84. (*Id.* at 1.)

As explained below, the Court finds that Plaintiff cannot prevail on her ADEA discrimination claims and accordingly grants

13

Defendant's motion for summary judgment as to that claim. Having dismissed Plaintiff's ADEA claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

## I.  ADEA Claim

The Court first examines Plaintiff's claim arising under the ADEA, before turning to her state law claims. *See Doolittle v. Bloomberg L.P.*, No. 22-CV-9136 (JLR), 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023) (finding that the 2019 amendment of the NYSHRL "rendered the standard for NYSHRL claims closer to the standard of the NYCHRL.").

### A.  Legal Framework

Discrimination claims under the ADEA "are analyzed under the *McDonnell Douglas* burden-shifting framework." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 177 (2d Cir. 2023) (citing *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012). Under this framework, "once a plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employer's action against the employee. If the employer does so, then the burden shifts back to the employee to show that the employer's articulated reason is pretext for discrimination." *Truitt v. Salisbury Bank & Tr. Co.*, 52 F.4th 80, 86-87 (2d Cir. 2022) (internal quotation marks omitted) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804-05

14

(1973)).  "The plaintiff bears 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'"  *Carr*, 76 F.4th at 177 (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981)).

"'[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action.'"  *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421 (2d Cir. 2021) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, (2009) (finding that "[w]ithout sufficient evidence that [defendant]'s decision to select a new pre-law director was because of [plaintiff]'s age, no reasonable juror could find that her age was a but-for cause of the decision to replace her.").

## B.   Prima Facie Case

"Under the McDonnell Douglas scheme, establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  "To establish a prima facie case, a plaintiff with an age discrimination claim must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Bucalo*, 691 F.3d at 129.  These are "minimal" requirements, and

15

the burden they impose on a plaintiff is "not onerous." *Id.* at 128.

There is no question that Plaintiff was within the age group protected by the statutory provisions under which she brings her claim.  The ADEA's protections apply to "individuals who are at least 40 years of age." 29 U.S.C. § 631(a).  Plaintiff, who was 84 years old at the time she was terminated by Defendant, is plainly within the protected class under the ADEA.  The parties do not dispute that Plaintiff was qualified to work as the Director of Energy Services, or that Defendants' termination of Plaintiff's employment constituted an adverse employment action.  Thus, Plaintiff can establish the first three elements of a prima facie case of age discrimination.

"An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in [] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). "In the context of age discrimination claims, an inference of discrimination arises, for example, when the plaintiff is 'replaced by someone substantially younger.'" *Rimpel v. AdvantageCare Physicians, P.C.*, 486 F. Supp. 3d 625, 634 (E.D.N.Y.

16

2020) (quoting *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 187 (2d Cir. 2006)).

Plaintiff contends that four sets of circumstances surrounding her termination give rise to an inference of discrimination.  First, Plaintiff alleges that there was a pattern of biased treatment at Grenadier, including certain comments by Moorehead that reflect his age-related bias.  (Pl. Mem. at 10-15.) Second, Plaintiff argues that the removal of Grenadier's CEO, Michetti, took place "under circumstances evidencing age bias." (*Id.* at 15-16.)   Third, Plaintiff argues that her work was reassigned to two employees who were, at 60 and 58, more than two decades younger than her.  (*Id.* at 16-21.)   Fourth, Plaintiff argues that Grenadier's company-wide layoffs resulted in the average age of the company's leadership team decreasing by more than a decade and a decrease in the percentage of employees over 70 from 9% to 4%.  (*Id.* at 21-24.)  The Court will consider each set of circumstances in turn.

### 1. Moorehead's Comments

Plaintiff argues that two comments by Moorehead in particular support an inference of discrimination.  First, "[i]n or around October 2019, Moorehead asked [Plaintiff] how much longer [she] planned to work."  (ECF No. 46-4, Declaration of Barbara Tillman ("Tillman Decl."), ¶ 35.)  Second, "[a]t some point in mid-2019, Moorehead called [Plaintiff] and asked [her] if [she] was able to

17

come into the office every day . . . [and] [f]rom the question and his tone, [she] understood that Moorehead was implying [she] was too old and feeble to physically make it into the office." (*Id.* ¶ 34.)   The Court does not find that the remarks by Moorehead support Plaintiff's ability to establish an inference of discrimination.   As the new CEO of Grenadier, which was facing the loss of one third of its business, Moorehead was overseeing Grenadier's organizational restructuring along with several rounds of layoffs.   (Def. 56.1 ¶¶ 37, 49; Pl. 56.1 ¶ 37.)

Remarks regarding a plaintiff's age or suggesting an employer's preference for younger workers may give rise to an inference that the plaintiff's termination was motivated by age discrimination, though "[t]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (internal quotations omitted).   In determining whether a remark is probative of discrimination, courts "have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."

18

*Id.*

Considering the first factor, it is undisputed that Moorehead was involved in the decision to terminate Plaintiff.  (Def. 56.1 ¶ 157.)  Nonetheless, the remaining factors weigh against finding the remarks probative of discrimination.  The remarks in question were made several months before Plaintiff was terminated, and the Court does not find the content of the remarks to support an inference of discrimination.

Considering Moorehead's question about how much longer Plaintiff planned to work, the Court notes that the Second Circuit has explained that merely questioning an employee about when they plan to retire, even repeatedly, "[does] not raise an inference of age discrimination because they are legitimate questions an employer could ask an employee." *Bernstein v. New York City Dep't of Educ.*, No. 21-2670, 2022 WL 1739609, at *2 (2d Cir. May 31, 2022) (summary order); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997) ("The ADEA does not make all discussion of age taboo. Nor does the fact that [a plaintiff's] eligibility for early retirement came up in a conversation . . . support an inference that age played a role [in the alleged adverse employment action].").

Furthermore, Moorehead's question about whether Plaintiff was able to come into the office does not evince age-related discriminatory intent, based on the record.  *See Potash v. Fla.*

*Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 589 (S.D.N.Y. 2013) (finding, in the gender discrimination context, that the "[p]laintiff's mere subjective belief that she was discriminated against because of her gender does not sustain a gender discrimination claim"). According to Plaintiff's deposition testimony, she was working from home when Moorehead called her and asked her if she could "come into the office for now on every day." (Tillman Dep. at 55.) Plaintiff interpreted Moorehead's question as "his asking could I do it, was I disabled or not was the way I thought he was talking." (*Id.*) The Court does not find Moorehead's question, singly or in combination with other comments, to support an inference of discrimination. At the time of Moorehead's question, prior to Plaintiff's termination in March 2020, and prior to remote work engendered by the COVID-19 pandemic, Plaintiff was working from home, by her own admission, and Moorehead asked if she was able to work from the office instead, a reasonable question for any employee who was currently working remotely. The Court finds Moorehead's questions are markedly distinct from those presented in the case cited by Plaintiff, *Tomassi v. Insignia Fin. Grp., Inc.,* in which a manager "made frequent references to [the plaintiff's] age," suggested that "[the plaintiff] related well to and 'could understand the mentality of'" other senior citizens, and recommended the plaintiff retire "so that she could 'take time off to rest.'" 478

F.3d 111, 112 (2d Cir. 2007).

Finally, although the question about Plaintiff's retirement plans was made while simultaneously inquiring as to Plaintiff's interest in working as a consultant, both of the comments discussed above were made after Grenadier lost one-third of its revenue from Starrett City, and at least four months before the decision to terminate Plaintiff's employment. *See, e.g.*, *Yoselovsky v. Associated Press*, 917 F.Supp.2d 262, 278 (S.D.N.Y. 2013) (listing cases in which comments made four to five months prior to the plaintiff's termination did not constitute evidence of discrimination). Taken together, the Court does not find Moorehead's questions support an inference of discrimination.

### 2.   Plaintiff's Position Following Restructuring and the Termination of Michetti

Plaintiff also argues that other actions taken by Grenadier with regards to Plaintiff's employment and the termination of Michetti as CEO in April 2019 support an inference of discrimination. (Pl. Mem. at 10-11, 15-16.) Other actions that Plaintiff argues support an inference of discrimination include: (1) Moorehead proposed firing Plaintiff in May 2019 without having met her; (2) Moorehead only gave Plaintiff a cubicle, and not an enclosed office, in Grenadier's new office space; and (3) Moorehead demoted Plaintiff "on paper" by "placing her under LoRusso." (*Id.* at 10-12.)

The evidence Plaintiff cites in support of the contention that Moorehead had "proposed terminating" Plaintiff's employment prior to meeting Plaintiff is unavailing.  Plaintiff offers what appears to be an email chain dated May 17 through 22, 2019, between multiple individuals from Grenadier's Board of Directors, Starrett Companies LLC, Belveron Partners, and Javelin Residential.  (ECF No. 46-3, Exhibit CC to the Clark Declaration, at 209-13.) Attached to the email is a spreadsheet showing what the email describes as "assumptions around eliminating select GRC employees in the coming months."  (ECF No. 46-3, Exhibit DD to the Clark Declaration, at 215-24.)  Plaintiff is indeed listed in the group of individuals the document identifies as being slated for termination, but there is no evidence in the record to suggest that (1) Moorehead was the individual who proposed Tillman be terminated[4]; or (2) that the draft document was ever finalized and formally submitted to Grenadier for consideration.  (*Id.*) Furthermore, Moorehead testified at his deposition that "from [his] recommendations regarding the budget, regarding the payroll, staffing, [Plaintiff] was never contemplated nor her role

---

[4] Gray testified in his deposition that Michetti had previously recommended Plaintiff be terminated in connection with the loss of the Starrett City contract.  (Gray Dep. at 51.)  Michetti testified that "[t]here was never a formal decision that Barbara Tillman would be terminated" because the document that said Plaintiff would be terminated was "a working document."  (Michetti Dep. at 70.)  Michetti explained that BSC, the new owners of Starrett City, were evaluating whether to bring on existing Grenadier employees in a continuing role, and that no final decision had been made.  (*Id.* at 70-71.)  These discussions took place prior to the email thread involving Moorehead identified by Plaintiff.  (ECF No. 46-3, Exhibit CC to the Clark Declaration, at 209-13.)

contemplated in the [July 2019] layoff." (Moorehead Dep. at 219.)
Even if Moorehead had recommended that Plaintiff be terminated,
however, Plaintiff fails to explain why such a recommendation would
serve as evidence of age-related discrimination, beyond stating
that the recommendation was made, as Plaintiff asserts, "before
Moorehead had even met Tillman." (Pl. Mem. at 11.)  Without any
supporting evidence, the Court finds no basis for an inference of
discrimination based on age surrounding the alleged
recommendation.

Regarding Plaintiff's claim about being given a cubicle, the
Court finds no support for an inference of discrimination.
Following the loss of the Starrett City contract, Grenadier was
required to vacate its office space on the Starrett City property
and move to a one floor space in Industry City that largely
"consist[ed] of open office space" with only eleven enclosed
offices. (Def. 56.1 ¶¶ 93-96.)  Plaintiff did not receive an
enclosed office in the new space, nor did several other director-
level individuals, including the Director of Compliance, the
Director of Property Management, and the District Property
Manager. (Def. 56.1 ¶ 99.)  Moorehead later explained at his
deposition that Plaintiff did not receive an enclosed office
because "[u]nder the new prescribed [organizational] chart,
[Plaintiff] was not going to be a department head [and] . . . the
nature of special projects did not require [her work] to be under

23

lock and key[.]" (Moorehead Dep. at 160.) Though the determination of which employee gets what office real estate is always a sensitive subject, the Court finds no evidence that Plaintiff's treatment in receiving a cubicle supports an inference of discrimination.

Finally, regarding Plaintiff's claim about being "demoted" by being placed under Pat LoRusso ("LoRusso"), the Director of Construction and Technical Services, the Court finds no evidence to infer that the reassignment supports an inference of discrimination. As part of Javelin's initial review of Grenadier, led by Moorehead, Javelin conducted interviews with several executives and reviewed the various departments of the company. (Moorehead Dep. at 61.) Although the review was initially scheduled to take place over 90 days, it was later shortened to be a 30-day review given the necessities of Grenadier's relocation out of the Starrett City office space. (*Id.*) It is not clear why Plaintiff was not interviewed as part of the review, but Javelin's report noted that she "was not working from the corporate office." (Pl. Ex. A, at 8.) Coming out of the abbreviated review, Moorehead and Javelin recommended that Special Projects, the department Plaintiff oversaw, be brought under Operations/Technical Services, the department led by LoRusso. (*Id.* at 6-8.) Plaintiff's only evidence that the decision to bring her Special Projects within LoRusso's Operations/Technical Services Department was made with

24

discriminatory intent is her own testimony that Grenadier and Javelin preferred LoRusso because "he was [not] making [] as much money as I was" and "they got a better deal on it," and that Plaintiff thinks Grenadier "preferred to get rid of the older people." (Tillman Dep. at 133.) Thus, Plaintiff herself admits that her employer's decision was motivated in part by economic reasons, a motivation which undermines an inference that her age was a "but for" cause of the challenged adverse employment action. *McEvoy v. Fairfield Univ.*, 844 F. App'x 420, 421 (2d Cir. 2021); *see also Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) ("an employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age"). To the extent Plaintiff "thinks" Grenadier preferred to get rid of older people, and that motivated her reassignment, her subjective belief is not sufficient to support an inference of discrimination absent additional evidence. *See Potash*, 972 F. Supp. 2d at 589; *see also Mandell v. County of Suffolk*, 316 F.3d 368, 381 (2d Cir. 2003) ("generalized descriptions of pervasive [bias] within the [police department] are not sufficient to support an inference that" a specific employment action was tainted by that bias").

Turning next to Michetti's termination, Plaintiff alleges that Michetti was fired "under circumstances evidencing age bias." (Pl. Mem. at 15.) Michetti explained in her deposition that she

was "surprised" by her termination and that she did not know the reason why she was terminated. (ECF No. 48-2, Deposition of Felice Michetti ("Michetti Dep."), at 88.)   Michetti stated in her deposition that she formed no theories or beliefs as to the reason her employment was being terminated. (*Id.* at 89-90.)   Plaintiff admits that she did not speak to Michetti about the circumstances surrounding Michetti's termination.   (Tillman Dep. at 125.) Michetti was indeed replaced as CEO by a younger individual, Moorehead, and Grenadier's Board described a desire for a "new day and a new energy" to Michetti when terminating her.  (Michetti Dep. at 91-93.)  Ultimately, the Court finds that the decision to terminate Michetti, which was made in the immediate aftermath of the loss of the Starrett City contract, is not especially probative of the decision to terminate Plaintiff more than a year later. Nonetheless, the Grenadier Board's comments about a "new energy" could give rise to an inference of discriminatory intent with regard to terminating Michetti's employment, but not Plaintiff, even when viewed in the light most favorable to Plaintiff.

### 3.   Reassignment of Plaintiff's Work

Plaintiff does not allege, and the undisputed facts do not show, that she was replaced by a newly-hired employee, or that her work was given to a single younger colleague.  Rather, Plaintiff alleges that her work was redistributed to outside consultants along with LoRusso, and Warren Harr ("Harr"), Director of

26

Operations.  (Pl. 56.1 ¶ 216.)  At least one court in this circuit has found that the redistribution of a terminated employee's work among multiple younger colleagues is an "unexceptional circumstance" that is "insufficient to create an inference of discrimination." *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012); *see also Patterson v. J.P. Morgan Chase & Co.*, No. 01-CV-7513 (LMM), 2004 WL 1920215, at *4–5 (S.D.N.Y. Aug. 26, 2004) (finding no prima facie case where oldest employee in an office was terminated, but not replaced).

The cases that Plaintiff cites in support of her argument that the reassignment of her work establishes an inference of discrimination are inapposite because Plaintiff was not replaced by a younger employee.  In contrast to many of the cases cited by Plaintiff involving the elimination of positions during a reduction in force, Plaintiff was not one of many employees in a department – instead, she was the Director of Energy Services, a unique role at Grenadier with distinct responsibilities and with no other employees doing equivalent work inside Grenadier.  (Def. 56.1 ¶ 21.)  After Plaintiff was terminated, her energy-related tasks were transferred to third-party energy consultants, and neither party alleges that any other employees at Grenadier possessed Plaintiff's expertise in energy consulting.  (*Id.* ¶ 165.)

By comparison, in *Burger v. New York Inst. of Tech.*, the Plaintiff was one of "seven non-supervisory persons employed in

the accounting department" and was considered alongside two other employees for termination as part of an overall reduction in force. 94 F.3d 830, 832 (2d Cir. 1996).  Similarly, in *Preuss v. Kolmar Lab'ys, Inc.*, the defendant, a cosmetics manufacturer, failed to follow its internal seniority policies in eliminating several positions.  970 F. Supp. 2d 171, 193 (S.D.N.Y. 2013).  The remaining cases are similarly distinguishable. *See, e.g., Artope v. Ctr. for Animal Care & Control, Inc.*, No. 05-CV-9283 (KMW) (RLE), 2009 WL 874037, at *9 (S.D.N.Y. Mar. 27, 2009) ("even though Defendants eliminated Plaintiff's position . . . [t]he parties agree that [another individual], in the newly-created position of Director of Operations, was responsible for duties formerly performed by Plaintiff [and] Plaintiff was, in effect, replaced"); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000) ("upon [plaintiff's] termination his duties were transferred in part to Gounalis, a co-worker, who was 18 years younger than [plaintiff], and his remaining duties were given to Oravets, an employee 25 years younger, who was hired three months after Carlton was discharged.").

In the instant case, in contrast, Plaintiff was not one of many interchangeable employees being considered for termination, nor were her duties subsequently reassigned to a newly-hired employee shortly after her termination.  Instead, Plaintiff's work was almost entirely shifted to third-party consultants, with two

28

of her previous coworkers assuming some responsibility for supervising the performance of those consultants.  The Court finds that the redistribution of Plaintiff's work in the instant case does not support a prima facie case of discrimination.

### 4.    Plaintiff's Statistical Evidence

Plaintiff argues that "GRC discharged many of its oldest employees between March 2019 and May 2020," resulting in a "decrease in the percentage of GRC employees over 70 from 9% to 4%" and a decreased average age among executives from "61.6 years old to . . . 48.8 years old."  (Pl. Mem. at 20-21.)

It is true that "[w]here a plaintiff lacks evidence of employer conduct that directly expresses discrimination, the plaintiff may rely on statistical or other circumstantial evidence."  *Pollis v. New Sch. for Soc. Rsch.*, 132 F.3d 115, 123 (2d Cir. 1997).  However, "[i]f the plaintiff seeks to prove the discrimination by statistical evidence, . . . the statistics must support reasonably the inference that the employer's adverse decision would not have occurred but for discrimination."  *Id.* Accordingly, courts routinely reject statistics that are incomplete or unreliable.  *See Cruz v. Bernstein Litowitz Berger & Grossman LLP*, No. 20-CV-8596 (VF), 2023 WL 2691456, at *9 (S.D.N.Y. Mar. 29, 2023) (collecting cases); *see* also *Holowecki v. Fed. Exp. Corp.*, 644 F. Supp. 2d 338, 360-62 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 42 (2d Cir. 2010) (rejecting plaintiff's

reliance on "certain raw numbers and statistics" to show that a "disproportionately small number of FedEx couriers" reached retirement age because the statistical evidence was "fundamentally flawed"). Moreover, as will be discussed further *infra*, "[a]lthough a generalized statistical analysis of selections in a [reduction in force] can provide circumstantial evidence of an inference of discrimination in support of a prima facie case, as a matter of law, it is not sufficient to establish that the Defendant's legitimate business rationale for eliminating Plaintiff's position is false, or that her age or gender was the real reason for her termination." *Zito v. Fried, Frank, Harris, Shriver & Jacobson, LLP*, 869 F. Supp. 2d 378, 395-96 (S.D.N.Y. 2012).

As a threshold matter, Plaintiff has failed to provide any expert analysis to support her "statistical" evidence that purports to show a pattern by Defendant of terminating older employees. Statistical evidence that is used to show that an employer "exhibit[s] a pattern of . . . terminating older workers," must be "supported by expert analysis," to meet "minimal standards" of admissibility. *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515-16 (S.D.N.Y. 2010) (noting that expert analysis is necessary because without it "courts would have a difficult time ensuring that juries consider only 'statistically significant' data"); *see also Bernstein Litowitz Berger & Grossman LLP*, 2023 WL

30

2691456, at *10 (collecting cases).

Even if Plaintiff's proffered statistics were admissible, the Court does not find that Plaintiff's statistical evidence can establish a pattern of discrimination. For instance, Plaintiff argues that the average age of the executive team decreased significantly from March 2019 to May 2020. (Pl. Mem. at 22.) Plaintiff's own 56.1 Statement presents evidence that not all of the employees who departed Grenadier were terminated; some employees resigned or retired and some of the change in the average age can be attributed to reorganization of the company's structure and changes in the executive structure regarding who reports to the CEO. (Pl. 56.1 ¶¶ 221, 226, 229.) Similarly, Plaintiff argues that the percentage of employees over 70 years old decreased between March 2019 and May 2020, but does not specify whether the decrease was due to the employees' employment being terminated, or voluntary resignation, or other reasons. (*Id.* ¶ 217.) Furthermore, Plaintiff fails to argue or offer evidence that older employees were disproportionately terminated as compared to their younger counterparts who were similarly situated. Without such contextual information, no rational jury could draw any inference regarding Defendant's discriminatory intent, because the evidence presented by Plaintiff would be insufficient for a jury to find Defendants were more likely to terminate older employees. *See Saenger*, 706 F. Supp. 2d at 516 (statistical evidence could not be

31

used to show unlawful discrimination where "data in the record
only contain[ed] the ages of the doctors who Defendant fired" but
"d[id] not provide the ages of the doctors that Defendant did *not*
fire," and where "Plaintiff d[id] not even claim that the rate of
termination for older employees at [Defendant] exceeds the rate of
termination for younger employees," rendering the statistical
evidence "incomplete and anecdotal") (emphasis in original).

**5.   Plaintiff Has Failed to Establish a Prima Facie
Case**

Based on the above, the Court finds that Plaintiff has not
established that a reasonable factfinder could conclude that the
circumstances surrounding her termination create an inference of
age-based discrimination, and therefore Plaintiff has not
established a prima facie case for discrimination under the ADEA.
The only evidence which could possibly support an inference of
discrimination is the termination of Michetti, which took place a
year before Plaintiff's termination.  The Court therefore finds
that summary judgment is appropriate on this claim.  Nonetheless,
even assuming, *arguendo*, that Plaintiff's evidence was sufficient
to establish a prima facie case, Defendants have met their burden
to produce evidence suggesting a legitimate, nondiscriminatory
reason for Plaintiff's termination, as explained below.

**C.   Nondiscriminatory Justification**

"[A] plaintiff's demonstration of her prima facie case shifts

32

the burden of production to the defendant, who must produce evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason." *Bucalo*, 691 F.3d at 132. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. To carry its burden, the defendants "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection," such that the explanation is "legally sufficient to justify a judgment for the defendant[s]" and "frame[s] the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Id.* at 255-56.

### 1.   Grenadier's Weakened Financial State

Defendants argue that they terminated Plaintiff's employment because of Grenadier's "severely weakened financial state and the consequential, good faith restructuring of its business." (Def. Mem. at 19.) Defendants' claim is corroborated by documentary and testimonial evidence that is not in dispute. Plaintiff admitted as much in her deposition when she was asked whether the loss of the Starrett City contract had a large economic impact on Grenadier:

> [Q.] Do you know whether . . . the loss of Starrett City had a large economic impact on Grenadier? . . .
>
> A. It had a serious impact from what I've been told.
>
> Q. And who told you that?

> A. Specifically told? I don't even know if anyone told
> me. I just knew it because it was obvious, it's always
> been obvious . . . It was a very important property.

(Tillman Dep. at 88.)   Gray, a member of Grenadier's Board,
similarly testified at his deposition that Starrett City was
important to Grenadier, noting that he would estimate that more
than a "third" of Grenadier's revenue was derived from the Starrett
City contract.   (Gray Dep. at 37.)

The loss of the Starrett City contract led Grenadier to take
several steps to cut costs.  Gray explained in his deposition that
the "deterioration of the financial condition of [Grenadier] . . .
after the loss of the Starrett City contract . . . made us realize
that [the severance plan] was not . . . something that the company
could afford going forward. . . . [I]t was an entirely economic
decision."  (*Id.* at 184.)  Grenadier was also required to engage
in a significant organizational restructuring process, in order to
determine which of the employees it shared with Starrett City would
become employees of Starrett City's new management entity, which
employees would remain at Grenadier, and which employees would be
terminated.  (*See, e.g.,* Def. 56.1 ¶¶ 49-53; Gray Dep. at 45-58
(describing the process of determining how to restructure
Grenadier following the loss of the Starrett City contract).)
Robertson explained that both his salary and Plaintiff's were paid
partially by Starrett City "and [after the loss of the Starrett
City contract] we did not know if our positions were going to be

34

maintained or pulled over or sustained by DVL, by Grenadier, we didn't know."  (Robertson Dep. at 112-13.)

Grenadier also took steps to outsource several functions in the months following the loss of the Starrett City contract, which included moving certain accounting functions from in-house positions to external firms.  (Moorehead Dep. at 221.)  Similarly, Grenadier's safety manager was asked to become a consultant, and when she instead relocated for a different opportunity, her role was absorbed by the director of risk management along with a third-party consultant.  (*Id.* at 223.)  In preparing the budget for 2020, Grenadier's ownership identified a deficit of around $300,000 in Plaintiff's department, and asked Moorehead to figure out how to "right size" the department.  (*Id.* at 229-30.)  One of the recommendations that Moorehead made was "to move energy services to a third party" – either by providing a proposal to Plaintiff to do so as a consultant, or by hiring an outside third-party consultant to assume responsibility for energy services for the managed properties.  (*Id.* at 230-31.)  Moorhead also recommended downsizing the IT department from three to two employees, eliminating an office manager, eliminating additional support staff, and not replacing an accountant that was being terminated.  (*Id.* at 231-32.)

### 2.   Plaintiff's Objections to Witness Credibility

Without offering evidence to establish a dispute of material

fact, Plaintiff simply "denies" Grenadier's explanation that the layoffs and cost-cutting measures taken after the loss of the Starrett City contract were made "to cut costs after the loss of the Starrett City" contract. (*See, e.g.,* Pl. 56.1 ¶ 40 ("Deny that [revision of the severance policy] was required to cut costs as the factfinder is entitled to disbelieve the testimony of Robertson, an interested witness."); Pl. 56.1 ¶ 50 ("Deny that GRC has presented any documentary evidence that [layoffs from May 2018 to March 2019] [were] due to the loss of the Starrett City contract [and] . . . the factfinder is entitled to disbelieve the testimony of Robertson, an interested witness.").)

It is well-settled that a party opposing summary judgment must present admissible evidence to create a genuine dispute of material fact and that a district court may not make credibility determinations on a motion for summary judgment. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). "If the credibility of the movant's witness is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied." *Sterling Nat'l Bank & Trust Co. v. Federated Dep't Stores, Inc.*, 612 F. Supp. 144, 146 (S.D.N.Y. 1985). This is true even if the credibility of a critical interested witness is only partially undermined in a material way by the non-moving party's evidence. *Chem. Bank v. Hartford Accident & Indem. Co.*, 82 F.R.D. 376, 378-79 (S.D.N.Y.

1979) (denying summary judgment where non-moving party pointed to specific facts that "sufficiently attacked the credibility of the [moving party's] affiants so as to place that fact in issue.")

Here, the Plaintiff has offered no evidentiary facts that create genuine factual disputes or undermine the credibility of the witnesses offered by Grenadier beyond stating that they are "interested witnesses." (Pl. Mem. at 25.)  Plaintiff has not proffered any evidence, such as conflicting sworn testimony or documents, to establish a genuine material factual dispute warranting a trial.  "Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005).  Thus, though the Court will view the testimony of Robertson, Moorehead, and other individuals employed by Grenadier in the light most favorable to Plaintiff and must resolve any ambiguities in that testimony in Plaintiff's favor, the Court will not, without affirmative evidence warranting an adverse inference, disregard the witnesses' uncontroverted assertions. *See id; see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) ("[the plaintiff] cannot defeat summary judgment on a retaliation claim merely by impugning [Defendant's witness's] honesty").

To the extent Plaintiff attacks Moorehead's credibility directly, (Pl. Mem. at 26), the Court does not find Plaintiff's

arguments to be supported by the evidence.  Plaintiff argues that Grenadier "falsely state[d] that Moorehead conducted an 'in-depth review'" of Plaintiff's department when he was brought over as a consultant.  (*Id.*)  Plaintiff's allegations misstate and distort the record and the Defendants' 56.1.  As discussed *supra*, Moorehead explicitly stated in his report that a "formal review was not conducted" of Plaintiff's department, and he offered some "initial thought[s]" based on discussions with others at Grenadier.  (Pl. Ex. A, at 8-9.)  Plaintiff also claims that Moorehead falsely claimed at his deposition not to have proposed laying off Plaintiff prior to the submission of the 2020 budget, an allegation which is not supported by the record, as discussed *supra*.  (*See* ECF No. 46-3, Exhibits CC and DD to the Clark Declaration (email chain which does not show that Moorehead actually recommended to Grenadier that Moorehead be terminated in May 2019).)  Finally, Plaintiff disputes Moorehead's characterization of an earlier discussion with Plaintiff about setting up a consultancy to perform energy work.  (Pl. Mem. at 26.)  It is clear that Plaintiff walked away from her conversation with Moorehead concerned that she was going to be terminated, as stated in her October 4, 2019, email to Moorehead, (*see* Def. 56.1 ¶ 113), who replied that that was not the case in an email immediately afterward (*id.* ¶ 114).  Considered together, the Court does not find any evidence in the record that disputes or undermines Moorehead's credibility or prevents the

Court from considering Grenadier's undisputed evidence, including Moorehead's testimony, in this motion for summary judgment.

### 3.   The Decision to Terminate Plaintiff

As mentioned above, Moorehead recommended that, as part of efforts to "right size" the department at Grenadier that included Plaintiff, Plaintiff's work be transferred to a third party, either by converting Plaintiff to be a consultant or by hiring a new third party. (Moorehead Dep. at 229-31.)  Subsequently, Moorehead sent Plaintiff a formal proposal offering her a role as a consultant, which would pay her significantly less than she earned as full-time employee.  (*Id.* at 246-48.)  Moorehead was prepared to negotiate the proposal, but Plaintiff rejected it without submitting any counter-offer.  (*Id.* at 251-52.)  Moorehead subsequently notified Gray that Plaintiff had not accepted the proposal, and that if she did not make efforts to "continue the conversation," Moorehead would terminate her employment by the end of the first quarter of 2020.  (*Id.* at 254-55.)

Moorehead explained his reasoning behind deciding to terminate Plaintiff after she rejected the proposal, as being due to the fact that Plaintiff's department, Special Projects, was "not a revenue-generating division on a consistent basis" and that the cost savings Plaintiff's work resulted in were "primarily for the property [and] not for the management company."  (*Id.* at 269-70.)  Moorehead further explained that Plaintiff's workload did

not justify the salary that she was earning. (*Id.* at 270.)
Moorehead based his conclusion about Plaintiff's workload on
discussions he had with third parties. (*Id.* at 267-68.) For those
reasons, Moorehead recommended that Plaintiff be terminated. (*Id.*
at 269-70.) After Plaintiff's termination, she was not replaced,
and the work she did for properties that Grenadier managed was
shifted to third-party energy consultants. (*Id.* at 260.) Harr
and LoRusso provided some supervision for the third-party
consultants but did not perform Plaintiff's work directly. (*Id.*
at 261-63; Def. 56.1 ¶¶ 163-65.) Finally, Moorehead testified at
his deposition that the third-party energy consultants are not
paid by Grenadier itself, as Plaintiff's salary was paid directly
by Grenadier, but are instead paid via a commission the consultants
receive in connection with energy purchase contracts. (Moorehead
Dep. at 263-64.)

Grenadier's evidence that Plaintiff's role at the company was
eliminated due to the deteriorating financial situation in the
wake of losing the Starrett City contract is sufficient to satisfy
Defendants' burden of production. Financial hardship and the
elimination of a position constitutes a "legitimate,
nondiscriminatory reason" for Plaintiff's termination. *Bucalo*,
691 F.3d at 132. Because the evidence produced by Grenadier is
undisputed "admissible evidence which would allow the trier of
fact rationally to conclude that the employment decision [was] not

[] motivated by discriminatory animus," Plaintiff's prima facie case, to the extent it was sufficiently made, is adequately rebutted. *Burdine*, 450 U.S. at 257.

### D. Pretext

At the third stage of the *McDonnell Douglas* inquiry, the Plaintiff "may no longer simply rely on having made out a prima facie case" and the Court, in deciding whether to grant summary judgment, must "determine, by looking at the evidence [Plaintiff] has proffered and the counter-evidence [Defendants] [have] presented, whether [Plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause of the [Defendants'] decision to fire her." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). In so deciding, "it is important to consider whether the explanations that [Defendants] gave for [the Plaintiff's] firing were pretextual." *Id.*

To prevail on a claim brought under the ADEA, a plaintiff "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-78 (2009). Here, no reasonable jury could conclude by a preponderance of the evidence that that age discrimination was the "but-for" cause of Plaintiff's termination.

The Court has already discussed in detail the arguments by

Plaintiff to establish that Plaintiff's termination was motivated by age discrimination. Having found that Plaintiff failed to make out a prima facie case of discrimination under the ADEA, the Court likewise finds that Plaintiff has failed to present sufficient evidence that age discrimination was the "but-for" cause of her termination. As described *supra*, Plaintiff provides no evidence to refute Defendants' evidence of Grenadier's financial distress and the resulting need for layoffs, reorganization, and cost-cutting beyond generalized and unsupported attacks on witness credibility.

Plaintiff has also offered no evidence that Plaintiff was replaced after she was terminated, and it is undisputed that her work was primarily transferred to third-party consultants who were supervised by two remaining employees of Grenadier. The Court, therefore, concludes that Plaintiff was not replaced by a younger worker. *See Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 573 (E.D.N.Y. 1999) ("[A] discharged employee is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. Rather, a person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." (citation omitted)). The fact that Plaintiff was not replaced, and her duties were instead assumed by a combination of third-party

42

consultants and existing employees strongly supports a conclusion that Grenadier's reason for terminating Plaintiff was not pretextual.

Viewing the record as a whole, and in the light most favorable to Plaintiff as the non-moving party, the Court finds that even if Plaintiff has established an issue of fact as to whether Defendants' reasons were pretextual, it is a "weak" one, *see Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000), and the record is completely devoid of any evidence suggesting that age discrimination was the real, but for reason behind Grenadier's decision.  Accordingly, summary judgment in favor of Defendants and Plaintiff's ADEA claim is dismissed.

## II.  State Law Claims

### A.    NYCHRL Claim

Plaintiff also brings a claim of age discrimination under the NYCHRL.  Because those claims are before the Court solely through its supplemental jurisdiction—and the Court has granted summary judgment to Grenadier on Plaintiff's federal claim—the Court declines to reach the merits of the NYCHRL claim.

"District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be

43

considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("[T]he district court may also decide whether to exercise supplemental jurisdiction over this claim; it may determine that this area of law would benefit from further development in the state courts and therefore dismiss the claim without prejudice to refiling in state court."); *see also One Commc'ns Corp. v. J.P. Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims"); *Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

In this Circuit, NYCHRL claims must be analyzed "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Given the "slow development of case law regarding the appropriate standard by which to evaluate NYCHRL claims at the summary judgment stage," *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d

816, 835 (S.D.N.Y. 2013), the separate and independent inquiry the Court would need to undertake in this "evolv[ing]" area of law, *see id.* at 835 n.6, the factors of convenience, comity and judicial economy favor declining jurisdiction over Plaintiff's NYCHRL claims, *see, e.g., Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 37 (E.D.N.Y. 2015) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment as to ADEA and NYSHRL age discrimination and retaliation claims); *Downey v. Adloox Inc.*, No. 16-CV-1689 (JMF), 2018 WL 5266875, at *9 (S.D.N.Y. Oct. 23, 2018) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting summary judgment for defendants with respect to ADEA and NYSHRL claims); *Herrnson v. Hoffman, No. 19-CV-7110 (JPO)*, 2023 WL 2647603, at *5 (S.D.N.Y. Mar. 27, 2023) (declining to exercise supplemental jurisdiction over NYCHRL claims after granting defendants summary judgment on ADEA claim).

Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's claims under the NYCHRL, and they are dismissed, without prejudice to her right to re-file them in state court.

**B.   NYSHRL Claim**

Plaintiff also brings claims of age discrimination under the NYSHRL, over which the Court also declines to exercise supplemental jurisdiction.

Until recently, courts have adjudicated claims brought under the ADEA and NYSHRL together, as these statutes applied identical standards. *See, e.g., Downey v. Adloox, Inc.*, 789 F. App'x 903, 905 (2d Cir. 2019) ("Because ADEA claims have been held to be identical to NYSHRL claims, both are analyzed under the same framework.")   As under the ADEA, plaintiffs bringing age-discrimination claims under the NYSHRL had the burden of proving that age was the "but-for" cause of the challenged adverse employment action. *See Gorzynski*, 596 F.3d at 105 n.6 ("The law governing ADEA claims has been held to be identical to that governing claims made under the NY[S]HRL . . . we assume, without deciding, that the Supreme Court's *Gross* decision affects the scope of the NY[S]HRL law as well as the ADEA.") (citing *Sutera v. Schering Corp.*, 73 F.3d 13, 16 n.2 (2d Cir. 1995)).

The similar standards, however, have recently changed.  "The NYSHRL was amended on August 19, 2019 to provide that its provisions should be construed liberally 'regardless of whether federal civil rights law, including those laws with provisions worded comparably to the provisions of this article, have been so construed.'" *Deveaux v. Skechers USA, Inc.*, No. 19-CV-9734 (DLC), 2020 WL 1812741, at * 3 n.3 (S.D.N.Y. Apr. 9, 2020) (quoting Act of Aug. 12, 2019, sec. 6, 2019 N.Y. Laws 160 (codified at N.Y. Exec. Law § 300 (2019))).  "In other words, the NYSHRL was amended to render the standard for claims closer to the standard under the

46

NYCHRL." *Summit v. Equinox Holdings, Inc.*, No. 20-CV-4905 (PAE), 2022 WL 2872273, at *18 (S.D.N.Y. July 21, 2022) (internal quotation marks and citation omitted); *see also Williams v. N.Y.C. Transit Auth.*, 97 N.Y.S.3d 692, 695-96 (2d Dep't 2019) ("[W]here an adverse employment action is shown to be 'motivated by [unlawful] animus, even in part, the defendant may be held liable' under the NYCHRL.") (quoting *Singh v. Covenant Aviation Sec., LLC*, 16 N.Y.S.3d 611, 616 (2d Dep't 2015)).  The amendment was signed in August 2019 and applies to claims occurring on or after October 11, 2019, without retroactive effect.  *See McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020).

Because Plaintiff's primary claim relates to her termination in March 2020, the Court finds that the NYSHRL amendment would apply to at least that aspect of the instant case, if not all of Grenadier's actions leading up to her termination.  The Defendants initially did not account for the revised standard in their motion for summary judgment, analyzing the ADEA and NYSHRL claims as coextensive.  (*See* Def. Mem. at 5 n.2 ("Age discrimination claims under the NYSHRL are analyzed under the same framework as the ADEA." (citation omitted)).)  Plaintiff noted this oversight and explained the impact of the 2019 amendments on the NYSHRL.  (Pl. Mem. at 8.)  Defendants subsequently argued in their reply briefing that "nearly all of Plaintiff's allegations occurred prior to October 2019, including her demotion claim" but went on to address

Plaintiff's NYSHRL claim alongside Plaintiff's NYCHRL claim "to clearly illustrate that Plaintiff's state law claim is still meritless." (Def. Reply at 9 n.6.) That the Defendants initially briefed the NYSHRL claims under an outdated legal standard, at least in part, reinforces the reasons, articulated above in the discussion of Plaintiff's NYCHRL claims, for not exercising supplemental jurisdiction over these claims.

Considering the factors for exercising supplemental jurisdiction over the NYSHRL claims, the Court also dismisses those claims, like the NYCHRL claims, without prejudice. *See, e.g., Halkitis v. N.Y.C. Dep't of Educ.*, No. 19-CV-11753 (JMF), 2022 WL 392911, at *7 (S.D.N.Y. Feb. 9, 2022) (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims as matters "best left to the courts of the State of New York") (citations omitted); *Summit*, 2022 WL 2872273, at *18 (same).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to Plaintiff's ADEA claims and declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims. Plaintiff's claims under the NYSHRL and NYCHRL are dismissed without prejudice to Plaintiff's right to re-file and pursue them in state court. The Clerk of Court is requested to enter judgment in favor of the Defendants on Plaintiff's ADEA claims, dismiss the NYSHRL and NYCHRL claims without prejudice, and close this case.

**SO ORDERED.**

Dated:   August 12, 2024
         Brooklyn, New York

_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York